**Case No. 22-55846**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

———————————————

ALAISHA TYSHARI BROWDER, individually, and DORISTEEN COLEMAN,
as guardian ad litem for her minor children D.K.A. and M.K.T.,

*Plaintiffs-Appellants,*

v.

COUNTY OF SAN BERNARDINO, JEREMIAH CORNETT, THOMAS
BOYDSTON,

*Defendants-Appellees.*

———————————————

Appeal from the United States District Court
for the Central District of California
Civil Case No. 5:19-cv-02306-JGB-SP
(Honorable Jesus G. Bernal)

———————————————

**DEFENDANT-APPELLEE
THOMAS BOYDSTON**

**ANSWERING BRIEF**

———————————————

John M. Fujii, SBN 172718
Mahadhi Corzano, SBN 254905
SILVER & WRIGHT LLP
3 Corporate Park, Suite 100
Irvine, California 92606
Tel: 949-207-6804
Fax: 949-385-6428
Email: JFujii@SilverWrightLaw.com

*Attorneys for Defendant-Appellee*
THOMAS BOYDSTON

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**................................................................1

**JURISDICTIONAL STATEMENT**.........................................2

**STATEMENT OF THE ISSUES**...........................................3

     **Violations Of The Record Requirements**....................................3

     **Waiver**....................................................................3

     **Integral Participant**....................................................3

     **Protective Sweep During Execution Of Search Warrant**.......................4

     **Qualified Immunity For Line Officer**.........................................4

**STATEMENT OF THE CASE**..............................................5

**STANDARD OF REVIEW**................................................6

**ARGUMENT**.........................................................7

  **I.**  **Appellants' Failure To File The Required Excerpts Of Record Serves As A Basis To Affirm The Judgment.**........................................7

  **II.**  **Appellants Waived Any Arguments Against Boydston Unrelated To Their Claims For Excessive Force And Unreasonable Search By Failing To Raise These Claims Against Boydston In The District Court Or In Their OB.**.........................................9

  **III.**  **Except For Appellants' Excessive Force Claim, Boydston Was Not An Integral Participant To Be Held Liable On Appellants' Remaining Constitutional Claims.**.........................................15

**A. Boydston Did Not Meaningfully Participate In Appellant Browder's Arrest.** ...................................................................17

**B. Boydston Did Not Meaningfully Participate In Obtaining The Search Warrant.** ..............................................................19

**C. Boydston Did Not Meaningfully Participate In The Prosecution Of Appellant Browder's Criminal Case.** ...................................20

**D. Boydston Did Not Meaningfully Participate In Any Deliberate Fabrication Of Evidence.** ..................................................21

**E. Boydston Did Not Meaningfully Participate In The Interference Of Appellants' Familial Relationship.** .....................................21

**IV. The District Court Correctly Adjudicated Appellants' Excessive Force Claim Against Boydston In The Protective Sweep Of Appellants' Apartment.** ...................................................................22

**A. The Undisputed Facts Establish That Boydston Did Not Use Excessive Force In The Protective Sweep Of Appellants' Apartment.** ...................................................................22

**B. Boydston Is Entitled To Qualified Immunity In Connection With The Protective Sweep Of Appellants' Apartment.** .........................33

**V. The District Court Properly Granted Boydston Summary Judgment On Appellants' Unreasonable Search Claim.** ..............................36

**A. Appellants' Unreasonable Search Claim Fails As A Matter Of Law Because There Was A Valid Search Warrant.** ...............................36

**1. Boydston Reasonably Relied Upon A Valid Search Warrant.** ....37

**B.** **Boydston Is Entitled To Qualified Immunity On Appellants' Claim Of An Unreasonable Search Of Their Apartment.** .........................39

**VI.** **The District Court Properly Granted Boydston Summary Judgment On Appellants' Unreasonable Seizure Claim.** ..............................40

**A.** **Appellants' Detention During The Execution Of The Search Warrant Was Lawful.** ...........................................................40

**B.** **There Was Probable Cause To Arrest Appellant Browder For Forgery.** .................................................................................41

**C.** **There Was Probable Cause To Arrest Appellant Browder For Child Endangerment.** ..................................................................47

**D.** **Boydston Is Entitled To Qualified Immunity In Connection With The Detentions And Arrests.** .............................................53

**E.** **Boydston Is Entitled To Prosecutorial Immunity In Connection With The Arrests.** ..............................................................54

**VII.** **The District Court Properly Granted Boydston Summary Judgment On Appellants' Malicious Prosecution Claim.** ..............................55

**VIII.** **The District Court Properly Granted Boydston Summary Judgment On Appellants' Claim For Interference Appellants' With Parent-Child Relationship.** ..............................................................................56

**IX.** **The District Court Properly Granted Boydston Summary Judgment On Appellants' Claim For Deliberate Fabrication Of Evidence.** ...............59

**X.** **Appellant Browder's State Law Claims Are Meritless.** ........................61

**A.  The False Arrest Claim Fails Because There Was Probable Cause To Arrest Appellant Browder.** ....................................................61

**B.  The Trespass Claim Fails Because Cornett Had A Valid Warrant.** .........................................................................................61

**CONCLUSION** .............................................................................62

**CERTIFICATE OF COMPLIANCE** ................................................63

**STATEMENT OF RELATED CASES** ...............................................64

**CERTIFICATE OF SERVICE** .........................................................65

# TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*Act Up!/Portland v. Bagley*, 988 F.2d 868 (9th Cir. 1993) ......................................46

*Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921 (1972)..........................................41

*Allen v. City of Portland*, 73 F.3d 232 (9th Cir. 1995) ...............................................45

*Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074 (2011) ......................................34

*Avina v. United States*, 681 F.3d 1127 (9th Cir. 2012)..............................................26

*Bailey v. United States*, 568 U.S. 186, 133 S.Ct. 1031 (2013) ..........................25, 40

*Barry v. Fowler*, 902 F.2d 770 (9th Cir. 1990)..........................................................42

*Bernstein v. Unites States*, 990 F.Supp. 428 (D.S.C. Nov. 10, 1997*)* ....................28

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007)....................15, 16, 20

*Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004) ...............................................15

*Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015) ...........................................59

*Caldwell v. City & County of San Francisco*, 889 F.3d 1105 (9th Cir. 2018) ........54

*Carcamo v. Los Angeles County Sheriff's Dept.*, 68 Cal.App.5th 608 (2021)........61

*Chuman v. Wright*, 76 F.3d 292 (9th Cir. 1996)........................................................16

*David v. Kaulukukui*, 38 F.4th 792 (9th Cir. 2022) ...................................................58

*Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012 (1984) ...........................................34

*Dawson v. City of Seattle*, 435 F.3d 1054 (9th Cir. 2006).................................24, 26

*District of Columbia v. Wesby*, 583 U.S. 48, 138 S.Ct. 577 (2018).   .........41, 50, 51

*Downs v. Los Angeles Unified School Dist.*, 228 F.3d 1003 (9th Cir. 2000) ...........7

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958 (9th Cir. 2011) ................7

*Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018)............................................23

*Freeman v. Cate*, No. 10-1987-DMS-MDD, 2012 Westlaw 6162518 (S.D. Cal. July 31, 2012), report and recommendation adopted by 2012 Westlaw 6161946 (S.D. Cal. Dec. 11, 2012), aff'd 705 Fed.Appx. 513 (9th Cir. 2017) .......................................49

*Gasho v. United States*, 39 F.3d 1420 (9th Cir. 1994)............................................34

*Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865 (1989) ..........................23, 28, 32

*Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727 (1982)...................................33

*Hart v. Benton County (or) Sheriff's Office*, 654 Fed.Appx. 270 (9th Cir. 2016)...32

*Hart v. Parks*, 450 F.3d 1059 (9th Cir. 2006)........................................................41

*Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009)..................................30, 31, 36

*Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317 (1983) ..........................................41

*In re B.M.*, 6 Cal.5th 528 (2018)............................................................................51

*In re O'Brien*, 312 F.3d 1135 (9th Cir. 2002)..........................................................7

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376 (9th Cir. 2010)...................6

*International Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401 (9th Cir. 1985) .......................................10

*Jama v. City of Seattle*, 446 Fed.Appx. 865 (9th Cir. 2011) ..................................23

*Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116 (9th Cir. 2008).........7

*Jones v. Williams*, 297 F.3d 930 (9th Cir. 2002) ...................................................17

*Kaley v. United States*, 571 U.S. 320, 134 S.Ct. 1090 (2014) ................................41

*Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018) ......................................................18

*Kennedy v. Los Angeles Police Dept.*, 901 F.2d 702 (9th Cir. 1989) ......................46

*Kirkpatrick v. County of Washoe*, 843 F.3d 784 (9th Cir. 2016).......................56, 57

*Lassiter v. City of Bremerton*, 556 F.3d 1049 (9th Cir. 2009)................................55

*Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163 (9th Cir. 2013) ..............................6

*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) ......................................................51

*Los Angeles County v. Rettele*, 550 U.S. 609, 127 S.Ct. 1989 (2007).........23, 24, 26

*Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092 (1986) ....................................34, 53

*Maric v. Alvarado*, 748 Fed.Appx. 747 (9th Cir. 2018) .........................................50

*Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587 (1981)...............24, 25, 35, 40

*Miller v. National Broadcasting Co.*, 187 Cal.App.3d 1463 (1986) .......................62

*Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005) ...............................................29, 36

*Mullenix v. Luna*, 577 U.S. 7, 136 S.Ct. 305 (2015) ........................................34, 35

*Nicholson v. City of Los Angeles*, 935 F.3d 685 (9th Cir. 2019)............................15

*Norse v. City of Santa Cruz*, 629 F.3d 966 (9th Cir. 2010) ..................................6, 7

*Ogborn v. City of Lancaster*, 101 Cal.App.4th 448 (2002) ...................................61

*Onyenwe v. City of Corona*, No. CV-1201363-MMM-SP, 2013 Westlaw 12169375
(C.D. Cal. Dec. 1, 2013), aff'd., 637 Fed.Appx. 370 (9th Cir. 2016) ....................16

*Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657 (2003) ............................41

*Padgett v. Wright*, 587 F.3d 983 (9th Cir. 2009) ....................................................10

*Parke v. Raley*, 506 U.S. 20 (1992) ...........................................................................6

*Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371 (1980)....................................36

*Plumhoff v. Rickard*, 572 U.S. 765, 134 S.Ct. 2012 (2014) ...................................22

*People v. Bernal*, 42 Cal.App.5th 1160 (2019) ........................................................52

*People v. Harris*, 239 Cal.App.2d 393 (1966)..........................................................49

*People v. Odom*, 226 Cal.App.3d 1028 (1991)..........................................................49

*People v. Wilson*, 138 Cal.App.4th 1197 (2006) .......................................................50

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .....................................................................6

*Ramirez v. Butte–Silver Bow County*, 298 F.3d 1022 (9th Cir. 2002) aff'd sub nom.
*Groh v. Ramirez*, 540 U.S. 551, 124 S.Ct. 1284 (2004).................19, 35, 37, 38, 39

*Ramirez v. Ghilotti Bros. Inc.*, 941 F.Supp.2d 1197 (N.D. Cal. 2013*)*....................39

*Reynaga Hernandez v. Skinner*, 969 F.3d 930 (9th Cir. 2020)................................17

*Rivas- Villegas v. Cortesluna*, 595 U.S. 1, 142 S.Ct. 4 (2021)................................35

*Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002).......................28, 29, 36

*Salazar v. Brown*, 616 Fed.Appx. 354 (9th Cir. 2015)........................................9, 15

*Sekiya v. Gates*, 508 F.3d 1198 (9th Cir. 2007)....................................................6, 10

*Sharp v. City of El Monte*, No. CV 16-02097-AB-KS, 2017 Westlaw 11509792
(C.D. Cal. Sept. 1, 2017), aff'd sub nom. *Sharp v. Larriva*, 753 Fed.Appx. 473 (9th
Cir. 2019) .................................................................................................................16

*Sjurset v. Button*, 810 F.3d 609 (9th Cir. 2015)......................................................18

*Smiddy v. Varney*, 803 F.2d 1469 (9th Cir. 1986) ....................................................54

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ....................................................59

*Stevens v. Rose*, 298 F.3d 880 (9th Cir. 2002)...................................................46, 47

*Tatum v. City and County of San Francisco*, 441 F.3d 1090 (9th Cir. 2006) ........49

*Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir. 2008) ...............................18

*United States v. Artis*, 919 F.3d 1123 (9th Cir. 2019) .............................................37

*United States v. Bradley*, 321 F.3d 1212 (9th Cir. 2003) ........................................57

*United States v. Enslin*, 327 F.3d 788 (9th Cir. 2003)............................................40

*United States v. Graf*, 610 F.3d 1148 (9th Cir. 2010) ......................................15, 42

*United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675 (1985) ..............................38

*United States v. Kama*, 394 F.3d 1236 (9th Cir. 2005) ..........................................10

*United States v. King*, 687 F.3d 1189 (9th Cir. 2012) ............................................29

*Valdez v. Rosenbaum*, 302 F.3d 1039 (9th Cir. 2002)..........................................4, 6

*Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003)......................................33

*Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129 (9th Cir. 2017)................................10

*Yousefian v. City of Glendale*, 779 F.3d 1010 (9th Cir. 2015) ...............................43

## STATUTES

28 U.S.C. § 1291 .......................................................................................................2

Cal. Gov't Code § 821.8 ..........................................................................................61

Penal Code § 273a(b) ..................................................................................47

Penal Code § 470 ......................................................................................42

**RULES**

Federal Rules of Appellate Procedure, Rule 3 ...........................................2

Federal Rules of Appellate Procedure, Rule 56 .........................................6

**OTHER AUTHORITIES**

CALCRIM No. 1900 ...................................................................................42

U.S. Const. Amend. IV ..............................................................................36

# INTRODUCTION

The district court correctly granted summary judgment to Defendant-Appellee Thomas Boydston ("Boydston"). In this lawsuit, Defendant-Appellee Jeremiah Cornett ("Cornett") was investigating Appellant Alaisha Browder for forgery after her ex-boyfriend DeJuan Reed filed an incident report that he was the victim of identity theft. After several days of investigation, Cornett developed enough evidence to obtain probable cause for a search warrant.

On the morning of November 6, 2018, Boydston happened to be at work, and Cornett asked him and other detectives to assist him in executing a search warrant of Appellant Browder's apartment. After arriving at the apartment with the search warrant, Boydston entered the apartment with Cornett and the other detectives with guns drawn to conduct a protective sweep. Less than 30 seconds later, when detectives determined that no threat existed, they directed their guns away from Appellants and continued with their protective sweep, after which they began to conduct the search for documents identified in the warrant.

That was the extent of Boydston's involvement in this matter. Boydston was not involved in Cornett's decision to arrest Appellant Browder for forgery and child endangerment or Cornett's decision to take Appellant Browder's children into temporary protective custody. Boydston also did not fill out any arrest report, provide any evidence to the District Attorney's office, or testify at Appellant

-1-

Browder's criminal trial. Despite his very limited involvement, Appellants sued Boydston along with Cornett on all their claims.

For purposes of assessing potential liability, Boydston was an integral participant only in Appellants' Fourth Amendment excessive force and unlawful search claims related to the protective sweep and search of the apartment. The law and undisputed facts are clear that Boydston's actions during the protective sweep and his assistance in searching the apartment were reasonable and did not violate the Fourth Amendment. As a line officer, Boydston could reasonably rely on Cornett's representation as to the validity of the search warrant. In the event that a Fourth Amendment violation occurred, Boydston would be entitled to qualified immunity.

Thus, summary judgment for Boydston should be affirmed.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over the appeal of the August 12, 2022 Judgment under 28 U.S.C. § 1291. On September 9, 2022, Appellants timely filed a notice of appeal as required by Federal Rules of Appellate Procedure, Rule 3. (6-ER-1187-1209.)

## STATEMENT OF THE ISSUES

### Violations Of The Record Requirements

Can forcing the Court to comb through 6 volumes of 1,223 pages of documents like "pigs sniffing for truffles" and omitting relevant documents presented in the district court to prevent this Court from finding the undisputed evidence that Boydston's only involvement in this matter was that he was one of the several detectives who assisted Cornett in the execution of the search warrant serve as a basis for summary affirmance as to Boydston? The answer is yes.

### Waiver

Have Appellants waived arguments to the granting of summary judgment to Boydston by omitting a discussion of Boydston in their Opening Brief ("OB"), which focuses almost entirely on Cornett and his actions? The answer is yes.

### Integral Participant

Was Boydston an integral participant in obtaining the search warrant, in arresting and prosecuting Appellant Browder for forgery and child endangerment, or in the Cornett's decision to place Appellant Browder's minor children in temporary protective custody? The answer is no.

**Protective Sweep During Execution Of Search Warrant**

Was Boydston's participation in the protective sweep of the apartment where guns were directed toward Appellants for less than 30 seconds a violation of the Fourth Amendment? The answer is no.

**Qualified Immunity For Line Officer**

As a line officer, and not the lead detective, is Boydston entitled to qualified immunity?[1] The answer is yes.

---

[1] This Court may affirm on any ground that finds support in the record even if the district court did not address it in the order. *Valdez v. Rosenbaum*, 302 F.3d 1039, 1043 (9th Cir. 2002). Boydston raised the qualified immunity defense in his motion and reply and offered evidence in support of the defense. (Boydston SER-64-65, SER-79-82; 3-ER-378-515; Boydston SER-7-13, SER-15.)

## STATEMENT OF THE CASE

To avoid unnecessary duplication, Boydston refers generally to the Statement of the Case set forth in the Answering Brief of the County and Cornett (Dkt. No. 38) and only sets forth the undisputed facts as they apply distinctly to Boydston.  Boydston's only involvement in this case is that he happened to working on November 6, 2018 and was one of the several detectives that assisted Cornett in the execution of the search warrant of Appellants' apartment.  (See Boydston's Supplemental Excerpts of Record ("Boydston SER") Boydston SER-30, ¶22.)  Boydston was not involved in (1) Cornett's investigation of Appellant Browder for forgery, (2) in Cornett's drafting of the search warrant affidavit or obtaining the search warrant, (3) in Cornett's decision to arrest Appellant Browder, or (4) in Cornett's decision to place Appellant Browder's two minor children in temporary custody.  (Boydston SER-29-30, ¶21; Boydston SER-40, ¶41; Boydston SER-44-45, ¶¶49–52.)  Boydston also did not testify in Appellant Browder's criminal trial.  (Boydston SER-45, ¶53.)

When Cornett, Boydston, and other detectives executed the search warrant, they first conducted a protective sweep of Appellants' apartment.  It in undisputed that Boydston pointed his guns in the direction of Appellants for a maximum of 30 seconds.  (Boydston SER-34-35, ¶34.)  Boydston then assisted Cornett in searching Appellants' apartment for the evidence identified the search warrant.  (Boydston

SER-35, ¶35.)  That represents Boydston's entire involvement in this matter.

## STANDARD OF REVIEW

An order granting a motion to for summary judgment under Federal Rules of Civil Procedure, Rule 56 is reviewed *de novo*.  *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).  But because review is *de novo*, this Court may affirm on any ground that has support in the record, whether or not the district court invoked it.  *Valdez*, 302 F.3d at 1043.

Generally, an appellate court should presume that district court decisions are correct and that an appellant has the burden of overcoming this presumption. *Parke v. Raley*, 506 U.S. 20, 29 (1992); see also *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006).  An appellant is responsible for providing an adequate record on review or the appeal may be dismissed.  *Norse v. City of Santa Cruz*, 629 F.3d 966, 974 (9th Cir. 2010); see also *Sekiya v. Gates*, 508 F.3d 1198, 1200 (9th Cir. 2007) (opening brief was so deficient that court was "compelled" to strike it in its entirety and dismiss appeal).

An appellate court may affirm on any ground that is supported by the record, whether or not the district court's decision relied on the same grounds or reasoning in its decision.  *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1169 (9th Cir. 2013) (disagreeing with district court's abstention-based dismissal, but affirming

dismissal because plaintiffs failed to plead proper claim). If the decision under review is correct on any ground appearing in the record, an appellate court may affirm even if the district court states the wrong rationale or none at all. *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121 (9th Cir. 2008); see also *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 964, n. 3 (9th Cir. 2011) (affirming on ground rejected by district court and advanced by neither party on appeal).

## ARGUMENT

### I. Appellants' Failure To File The Required Excerpts Of Record Serves As A Basis To Affirm The Judgment.

An appellant is responsible for providing an adequate record on review or the appeal may be dismissed. *Norse*, 629 F.3d at 974. "In creating the excerpts of record for appeal, it behooves parties to treat appellate panels not as if we were pigs sniffing for truffles, … but instead to fill our troughs to the brim with the relevant, let alone necessary, information." *Downs v. Los Angeles Unified School Dist.*, 228 F.3d 1003, 1007, n. 1 (9th Cir. 2000) (internal citation omitted). "[F]ailure to present a sufficient record can itself serve as a basis for summary affirmance." *In Re O'Brien*, 312 F.3d 1135, 1137 (9th Cir. 2002).

Appellants omit from their Excerpts of Record any of Boydston's and

Cornett's reply documents in response to Appellants' opposition papers, most notably Boydston's Reply to Appellants' Statement of Genuine Facts in Dispute, which Boydston filed on July 11, 2022. (Boydston SER-19-47.) By doing do, Appellants' Excerpts of Record omit references to the undisputed evidence showing that:

1. Boydston was not involved in the investigation of Appellant Browder for forgery. (Boydston SER-29-30, ¶21.)

2. Boydston was not involved in Cornett's drafting of the search warrant affidavit or obtaining the search warrant. (Boydston SER-29, ¶20.)

3. Boydston was not involved in Cornett's decision to arrest Appellant Browder. (Boydston SER-40-41, ¶¶41–42.)

4. Boydston was not involved in Cornett's decision to place Appellant Browder's two minor children in temporary custody. (Boydston SER-41-42, ¶¶43–46.)

5. Boydston was not involved in the prosecution of Appellant Browder for forgery and child endangerment. (Boydston SER-44-45, ¶¶49–52.)

6. Boydston did not testify in the criminal prosecution of Appellant Browder. (Boydston SER-45, ¶53.)

7. Boydston's only involvement in this matter was that he happened to be on duty on November 6, 2018 and was one of the several detectives who

assisted Cornett in the execution of the search warrant of Appellants'
apartment. (Boydston SER-30, ¶22.)

Instead, Appellants force the Court to comb through 6 volumes of 1,223
pages of documents like "pigs sniffing for truffles" to find the undisputed evidence
that Boydston's only involvement in this matter was that he was one of the several
detectives who assisted Cornett in the execution of the search warrant of
Appellants' apartment. These violations of the record requirements can itself serve
as a basis for summary affirmance as to Boydston. Thus, the Court has discretion
to affirm the Judgment as to Boydston on this independent ground.

## II. Appellants Waived Any Arguments Against Boydston Unrelated To Their Claims For Excessive Force And Unreasonable Search By Failing To Raise These Claims Against Boydston In The District Court Or In Their OB.

Appellants waived their right to raise any issues that they did not raise in the
court below and any issues they omitted from their OB. In the context of this
appeal, Appellants' entire focus of their OB is on Cornett, the detective in charge
of the investigation. As to Boydston, the OB makes nary a reference to his name.

A reviewing court should not "consider matters not specifically and
distinctly raised and argued in the opening brief, or arguments and allegations
raised for the first time on appeal." *Salazar v. Brown*, 616 Fed.Appx. 354, 355

(9th Cir. 2015) (citing *Padgett v. Wright*, 587 F.3d 983, 986, n. 2 (9th Cir. 2009) (finding it would be "particularly inappropriate" to consider a matter not raised before the lower court or raised in the opening brief)). "[A]n issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it." *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1137 (9th Cir. 2017). Unless a party demonstrates "exceptional circumstances why the issue was not raised below," a court should not review the issue on appeal. *International Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985).

In addition, "[g]enerally, an issue is waived when the appellant does not specifically and distinctly argue the issue in his or her opening brief." *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005); see also *Sekiya v. Gates*, 508 F.3d 1198, 1200 (9th Cir. 2007) (opening brief was so deficient that court was "compelled" to strike it in its entirety and dismiss appeal).

Here, in their OB, Appellants only refer to Boydston[2] on isolated occasions in the following sentences:

---

[2] Boydston's name will be underlined in the following quoted passages from the OB.

1. <u>Page 13[3], Statement of Jurisdiction</u>: "Appellants … appeal an August 12, 2022 order … granting Motions for Summary Judgment by Appellees San Bernardino County, Jeremiah Cornett, and <u>Thomas Boydston</u> on Appellants' federal claims and supplemental state law claims."

2. <u>Page 18, Statement of the Case</u>: "After the warrant issued, Cornett and Appellee SBSD <u>Thomas Steven Boydston</u> executed it on the same day. [Citation.] When Cornett and <u>Boydston</u> executed their search warrant, Ms. Browder happened to be in the middle of moving to a new address…. She later directly informed Cornett and <u>Boydston</u> that she was in the process of moving."

3. <u>Page 19, Statement of the Case</u>: "Cornett and <u>Boydston</u> detained Browder, D.K.A., and M.K.T. at gunpoint during the search. [Citation.] … During Cornett and <u>Boydston</u>'s search of Browder's home, they found numerous documents showing that Mr. Reed had lived with Browder at her previous Nisqualli Road address. [Citation.] She again informed Cornett and <u>Boydston</u> of her relationship to Mr. Reed, including the fact that he once lived with her at the Nisqualli Road address…. [¶] Ms. Browder informed Appellees Cornett and <u>Boydston</u> that she was in the

---

[3] References to the pagination of the OB are to this Court's ECF pagination on the top of the pages and not to Appellants' pagination on the bottom of the pages.

process of moving."

4. <u>Page 20, Statement of the Case</u>: "Nevertheless, Appellees Cornett and <u>Boydston</u> arrested Browder, allegedly for felony forgery, and for felony child endangerment. (2-ER-232-245,[4] 246-247[5].) Upon arresting Browder, Appellees Cornett and <u>Boydston</u> took D.K.A. and M.K.T. away from their mother and placed them in the custody of Child Protective Services. (2-ER-232-245.)"

5. <u>Page 22, Procedural History of Litigation</u>: "Appellee Thomas <u>Boydston</u> filed his own motion for summary judgment."

6. <u>Page 26, Procedural History of Litigation</u>: "Here, Plaintiffs allege that Cornett and <u>Boydston</u> deliberately fabricated the following: (1) false statements in the police report about the condition of Browder's

---

[4] 2-ER-232–245 is Exhibit 10 to the declaration of Appellants' attorney Brenton Hands in opposition to Appellees' summary judgment motions, which is a copy of Cornett's Incident Report, dated November 7, 2018, for the arrest of Appellant Browder for forgery and child endangerment. The only reference to Boydston in Cornett's Incident Report is the following sentence: "During the search of the kitchen area of the residence, <u>Detective Boydston</u> located a box on the kitchen counter. Inside the box was personal information belonging to Reed." (2-ER-241 [underlining added].)

[5] 2-ER-246–247 is Exhibit 11 to the declaration of Appellants' attorney Brenton Hands, which is a copy of Cornett's handwritten Probable Cause Declaration, dated November 6, 2018, for the arrest of Appellant Browder for forgery and child endangerment. There is no reference to Boydston in this document.

-12-

residence and about knives in the cushions; (2) false testimony in Browder's criminal trial about the residence's condition and knives in the cushions; (3) photographing the residence's condition; and (4) withholding information from the prosecution that Browder was moving, had a U-Haul truck, and had keys to the truck.  (FAC ¶¶ 101, 102.)"

7. <u>Page 51, Argument on Appellant Browder's Claim for False Arrest for Child Endangerment</u>:  "Ms. Browder informed Appellees Cornett and <u>Boydston</u> that she was in the process of moving."

8. <u>Page 65, Argument on Appellant Browder's Claim for Excessive Force</u>: "Here, it in undisputed that Appellees pointed guns at Plaintiff and her minor children, all of whom were unarmed and posed no threat to Appellees, for up to 30 seconds.  Cornett and <u>Boydston</u> admit that they detained Browder, [] D.K.A., and M.K.T. at gunpoint during the search."

In essence, Appellants' OB is directed almost exclusively at Cornett, and barely references Boydston.  This makes sense since Cornett was the detective in charge of the investigation of Appellant Browder for forgery.  In contrast, Boydston's only involvement in this case was that he happened to be on duty on November 6, 2018 and was one of the several detectives who assisted Cornett in the execution of the search warrant.  (Boydston SER-30, ¶22.)

Appellants also make generic references in their OB to "Appellees."

-13-

However, a closer examination of Appellants' references to "Appellees" shows that Appellants are referring to Cornett, and not Boydston.  For instance, Appellants make an argument that "because of Appellees' repeated misrepresentations and omissions, both to the District Attorney, and the Court, the filing DDA [Deputy District Attorney], Melissa Pedroza, did not make her filing decision on the basis of true, accurate, and complete information.  (See 3-ER-338–346.)."  (OB, p. 57.)  3-ER-338–346 is Exhibit 18 to the declaration of Appellants' attorney Brenton Hands, which is an excerpt of the transcript of the deposition of Deputy District Attorney Melissa Pedroza.  There is no reference to Boydston in this deposition excerpt.  In fact, when Deputy District Attorney Pedroza was asked, "did you ever speak with Detective Boydston prior to filing the criminal complaint [against Appellant Browder] regarding the November 6, 2018, incident?", she responded, "No."  (3-ER-338, lines 6–9.)[6]

Thus, Appellants' omissions to references to Boydston in their OB establish that Appellants have waived all their arguments challenging the summary judgment granted to Boydston, except for their claim against Boydston for

---

[6] As another example, Appellants make an argument that "Appellees authored documents containing material misrepresentations and omissions in order to cause Browder's arrest and prosecution for child endangerment."  (OB, p. 60.)  However, the undisputed evidence shows that Boydston did not author any documents related to the search warrant, the arrest and prosecution of Appellant Browder, or the temporary placement of her minor children in protective custody.  (Boydston SER-29-30, ¶¶20–21; Boydston SER-40-42, ¶¶41–42, 45.)

-14-

excessive force and unreasonable search. See *Salazar*, 616 Fed.Appx. at 355; see also *United States v. Graf,* 610 F.3d 1148, 1166 (9th Cir. 2010) (arguments that are undeveloped and/or unsupported by citation to authority are waived).

## III. Except For Appellants' Excessive Force Claim, Boydston Was Not An Integral Participant To Be Held Liable On Appellants' Remaining Constitutional Claims.

Even assuming Appellants have not waived their arguments against Boydston for their non-excessive force constitutional claims, the law dictates that Boydston is not liable for these constitutional claims because he did not "integrally participate" in the alleged violations for unlawful arrest (claim 1), unlawful search based on search warrant lacking probable cause (claim 2), malicious prosecution (claim 3), deliberate fabrication of evidence (claim 4), and interference with parent-child relationship (claim 5). For integral participation to apply, the police officer must (1) participate in some meaningful way in the constitutional violation, and (2) be aware of the decision to commit the alleged violation and did not object to it. *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019) (citing to *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004); see also *Blankenhorn v. City of Orange*, 485 F.3d 463, 481, n. 12 (9th Cir. 2007) (integral participation requires "some fundamental involvement in the conduct that allegedly caused the violation"). "While there is no bright-line test for determining what constitutes

-15-

'fundamental involvement,' courts have generally held that the integral participation standard requires either physical interaction with the suspect, or some knowledge of or control over the challenged conduct." *Onyenwe v. City of Corona*, No. CV-1201363-MMM-SP, 2013 Westlaw 12169375, at *8 (C.D. Cal. Dec. 1, 2013), aff'd., 637 Fed.Appx. 370 (9th Cir. 2016). Thus, an integral participant must play some personal role in the constitutional violation rather than simply being part of an investigative team.[7] For instance, this Court has held that police officers who are not integrally involved in providing false statements to the prosecutor are not liable for malicious prosecution. *Blankenhorn*, 485 F.3d at 482.

In this case, Appellants have not met their burden in establishing that Boydston's integral participation in causing Appellant Browder to be arrested (claim 1), causing the search warrant to be issued (claim 2), being criminally prosecuted with malice (claim 3), having evidence be deliberately fabricated against her (claim 4), or having Appellant Browder's children taken away from her (claim 5). *Sharp v. City of El Monte*, No. CV 16-02097-AB-KS, 2017 Westlaw 11509792, at *4 (C.D. Cal. Sept. 1, 2017), aff'd sub nom. *Sharp v. Larriva*, 753

---

[7] Police officers may not be held liable for unlawful acts that they have not participated in even though they were "team members" of those who committed them. The "team effort" theory has been rejected by this Court because it "allows a jury to find a defendant liable on the ground that even if the defendant had no role in the unlawful conduct, he would nonetheless be found guilty if the conduct was the result of a 'team effort.'" *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996).

Fed.Appx. 473 (9th Cir. 2019) ("The plaintiff has the burden of establishing the officer was an integral participant in the alleged constitutional violations.").

### A. Boydston Did Not Meaningfully Participate In Appellant Browder's Arrest.

The facts concerning Boydston are undisputed. Boydston did essentially two things during the events the led to this lawsuit: He provided armed backup during the initial entry of the apartment and assisted in the search of residence. (Boydston SER-32-35, ¶¶28–35.) These actions are not enough to attach liability against Boydston for Appellant Browder's arrest on forgery and child endangerment charges. This Court requires a causal connection between the officer's actions and the constitutional violation, similar to the standard of causation under tort law. *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 942 (9th Cir. 2020). And the mere presence of an officer being on the scene where the violation occurred is insufficient to establish integral participation. See *Jones v. Williams*, 297 F.3d 930, 939 (9th Cir. 2002) ("We reject the idea that mere presence at a search or membership in a group, without personal involvement in and a causal connection to the unlawful act, can create liability under section 1983.").

Providing armed backup during the initial protective sweep and assisting in of search of the residence did not cause Appellant Browder to be arrest for forgery

or child endangerment. Appellant Browder would have nevertheless been arrested. Cornett arrested her for forgery based on information gathered from his investigation, Appellant Browder's admission of signing the 2016 Lease, and her inability to provide proof that she had consent in signing the 2016 Lease on Reed's behalf. (Boydston SER-35-37, ¶¶35–38.) Also, Cornett arrested Appellant Browder for child endangerment based on his observation of the residence, the strong foul odor he detected upon entry, and Appellant Browder's admission that the residence was inhabitable. (Boydston SER-37-40, ¶¶39–42.) Thus, Boydston did not meaningfully participate in Appellant Browder's arrest.

Furthermore, the undisputed evidence establish that Boydston was not involved in Cornett's decision to arrest Appellant Browder. To find a constitutional violation, courts require there be "a collective decisionmaking process among the officers." *Sjurset v. Button*, 810 F.3d 609, 619 (9th Cir. 2015); see also *Keates v. Koile*, 883 F.3d 1228, 1242 (9th Cir. 2018) (finding no integral participation of officers who removed children from a household were not "privy to any discussions, briefings or collective decisions" made by the agency "in its protective-custody determination"); see also *Torres v. City of Los Angeles*, 548 F.3d 1197, 1206 (9th Cir. 2008) (finding no integral participation of a detective where there was no evidence that she instructed the arresting officer to arrest the plaintiff or consulted with the arresting officer prior to the arrest).

Appellants do not dispute that there was no communication between Boydston and Cornett prior to Cornett's decision to arrest Appellant Browder. (Boydston SER-40, ¶42.)[8] Therefore, Appellants have not met their burden in presenting evidence to establish Boydston integrally participated in Appellant Browder's arrest.

## B.     Boydston Did Not Meaningfully Participate In Obtaining The Search Warrant.

This Court has found that a line officer's reliance of the lead investigator's representation that the search warrant was valid is objectively reasonable. See *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1028 (9th Cir. 2002) ("[line officers] may accept the word of their superiors that they have a warrant and that it is valid. So long as they make inquiry as to the nature and scope of the warrant, their reliance on leader's representation about it is reasonable."), aff'd sub nom. *Groh v. Ramirez*, 540 U.S. 551, 124 S.Ct. 1284 (2004).) It is undisputed that Boydston, a line officer and not the lead detective, was not involved in investigating the alleged forgery, drafting the search warrant affidavit, or obtaining the search warrant.

---

[8] With regard to Fact No. 42, the district court correctly concluded that Appellants "partially dispute this fact, but they offer no evidence that contradicts it." (1-ER-7, n. 13.)

(Boydston SER-29-30, ¶¶20–21.)[9]  Accordingly, summary judgment was properly

granted in favor of Boydston as to Appellant Browder's Fourth Amendment claim

for unlawful search by causing the search warrant to be issued.

### C.     Boydston Did Not Meaningfully Participate In The Prosecution Of Appellant Browder's Criminal Case.

Appellant Browder has presented no evidence that Boydston integrally

participated in prosecuting her with malice and without probable cause.  The case

of *Blankenhorn*, 485 F.3d 463, is instructive.  In *Blankenhor*n, this Court affirmed

the granting of summary judgment for two police officers on plaintiff's malicious

prosecution claim, which was based on another officer providing false information

in the police report he drafted.  *Id*. at 482.

Similar to *Blankenhorn*, Appellant Browder's malicious prosecution claim is

predicated on false and omitted statements in the police report.  Appellant Browder

has presented no evidence that Boydston either assisted or drafted the police report,

or that he provided false statements to deputy district attorneys.  (Boydston SER-

44-45, ¶¶49–50, 52–53.)  Since Boydston did not participate, let alone

meaningfully participate, in the criminal prosecution of Appellant Browder,

summary judgment was correctly granted in favor of Boydston as to Appellant

---

[9] With regard to Fact No. 21, the district court correctly concluded that Appellants "dispute this fact, but they offer no evidence that contradicts it."  (1-ER-6, n. 7.)

Browder's Fourth Amendment claim for malicious prosecution.

### D. Boydston Did Not Meaningfully Participate In Any Deliberate Fabrication Of Evidence.

Appellants have presented no evidence that Boydston integrally participated in fabricating false evidence. The evidence that was allegedly fabricated were false and omitted statements in the police report and testimony of Cornett at Appellant Browder's criminal trial. Since Boydston did not integrally participate in drafting the police report, providing evidence to the District Attorney's Office, or testifying at trial, summary judgment was properly granted in favor of Boydston on Appellants' Fourteenth Amendment claim for deliberate fabrication of false evidence. (Boydston SER-44-45, ¶¶49–50, 52–53.)

### E. Boydston Did Not Meaningfully Participate In The Interference Of Appellants' Familial Relationship.

Boydston was not involved in the decision to place Appellant Browder's minor children, DKA and MKT, into temporary protective custody. The undisputed evidence shows that Boydston did not speak to DKA and MKT, did not collaborate with Cornett, or did not make telephone calls to place them with a responsible adult prior to Cornett making the decision to place them into temporary protective custody. (Boydston SER-40-42, ¶¶42–45.) Accordingly, summary judgment was correctly granted in favor of Boydston as to Appellants' Fourteenth

Amendment claim for interference of familial relationship.

Thus, except for assisting Cornett in the execution of the search warrant with the other detectives, Boydston had no control over these other matters since he was not the lead detective on the case.  Therefore, Boydston is entitled to summary judgment as to Appellants' non-excessive force constitutional claims.

## IV.  The District Court Correctly Adjudicated Appellants' Excessive Force Claim Against Boydston In The Protective Sweep Of Appellants' Apartment.

### A.  The Undisputed Facts Establish That Boydston Did Not Use Excessive Force In The Protective Sweep Of Appellants' Apartment.

Boydston does not argue that he was not an integral participant in the protective sweep of Appellants' apartment.  Instead, Boydston's position is that his actions during the protective sweep did not violate the Fourth Amendment.

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774, 134 S.Ct. 2012 (2014).  The question of whether an officer has used excessive force "requires careful attention to the facts and circumstances of each particular case," and the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer

on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865 (1989). This is because "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–397.

The act of drawing,[10] displaying, and even pointing firearms during a very brief protective sweep of a premises being searched pursuant to a valid warrant has been deemed to be objectively reasonable for Fourth Amendment purposes under similar, if not worse, circumstances. See *Los Angeles County v. Rettele*, 550 U.S. 609, 614–615, 127 S.Ct. 1989 (2007) (rejecting Fourth Amendment claim by plaintiffs who were roused from bed and forced to stand naked for a "few minutes" at gunpoint); *Jama v. City of Seattle*, 446 Fed.Appx. 865, 867 (9th Cir. 2011) (SWAT team's act of pointing firearms at plaintiff during protective sweep and detention lasting 15–20 minutes was not excessive force).

The Supreme Court's decision in *Rettele* is instructive. In *Rettele*, while executing a search warrant to arrest three African American suspects that had moved out three months earlier, deputies entered a bedroom with guns drawn and found a Caucasian man and woman naked in bed. *Rettele*, 550 U.S. at 611. The

---

[10] This Court has noted that "[n]either we nor the Supreme Court have held that merely unholstering a firearm, without more, constitutes excessive force." *Foster v. City of Indio*, 908 F.3d 1204, 1218 (9th Cir. 2018).

-23-

deputies ordered them to get out their bed and show their hands. *Ibid*. The couple stood up and reached for clothes and sheets to cover themselves, but the deputies told them not to move, and they were held at gunpoint for one to two minutes as the deputies secured the bedroom. *Ibid*. When they realized that they made a mistake, the deputies apologized and left the property. *Ibid*. The Supreme Court deemed the deputies' conduct in detaining the couple to be reasonable. *Id*. at 614. The *Rettele* court concluded that the deputies' conduct was "permissible, and perhaps necessary, to protect the safety of the deputies." *Ibid*. Also, the amount of time that the couple were held at gunpoint was reasonable because "the deputies needed a moment to secure the room and ensure that other persons were not close by or did not present a danger." *Id*. at 615. Also, the deputies were not required to allow the couple to cover themselves with sheets because "the risk of harm to both the police and the occupants are minimized if the officers routinely exercise unquestioned command of the situation. *Ibid*. (citing to *Michigan v. Summers*, 452 U.S. 692, 702–703, 101 S.Ct. 2587 (1981)).

This Court has drawn the same conclusion in allowing officers to exercise unquestioned command during an inherently dangerous situation, such as executing a warrant, to minimize the risk of harm to both the police and occupants. In *Dawson v. City of Seattle*, 435 F.3d 1054, 1059 (9th Cir. 2006), while executing an inspection warrant of boardinghouses for rodent infestation, officers "drew their

weapons, frisked the tenants, and scream[ed] at them, 'Get Up, get up, search warrant, [and] get out of your room.'" *Id*. at 1059. This Court affirmed summary judgment for the officers, holding that "it was reasonable for the police to enter the boardinghouses aggressively and drawing their sidearms." *Id*. at 1068. This Court reasoned that, when entering a property, "[a]llowing an unknown number of unidentified people to move about unsupervised during an involuntary inspection would dramatically increase the likelihood that an occupant could injure or kill an officer, or that an officer might mistakenly injure an occupant." *Id*. at 1067. Citing to *Summers*, this Court reiterated that, if the officers routinely exercise unquestioned command of the situation, the risk of harm to both the police and the occupants is minimized. *Ibid*.

In addition, the Supreme Court has repeatedly recognized that officers executing a search warrant are entitled "'to detain the occupants of the premises while a proper search is conducted.'" *Bailey v. United States*, 568 U.S. 186, 193, 133 S.Ct. 1031 (2013) (quoting *Summers*, 452 U.S. at 702). This is a "categorical" rule allowing for the detention of all occupants, even if the officers lack "particular suspicion" that the occupants were "involved in criminal activity or pose[ ] a specific danger to the officers." *Bailey*, 568 U.S. at 193.

As set forth above, the undisputed facts establish that the conduct of Boydston in the protective sweep of Appellants' apartment was reasonable and far

-25-

less than that the conduct of the officers in *Rettele* and in *Dawson*, where no excessive force was found. There is no evidence in the record that, prior to entering the residence, Boydston knew who was inside the residence or whether any of the residents might be armed or pose a threat to them. Being concerned for the safety of himself and his fellow detectives, Boydston drew his weapon when conducting the protective sweep. The unknown danger of entering a residence to execute a search warrant poses a threat to the safety of officers. See *Avina v. United States*, 681 F.3d 1127 (9th Cir. 2012) (finding no excessive force when police, while executing a search warrant, entered a home with guns drawn, forcefully pushed a resident to the ground, put a gun to his head, and told the resident not to move).

Here, Boydston's actions were reasonable especially given that Appellant Browder had been evasive and non-cooperative with investigative efforts, the occupants of the apartment did not respond to multiple knocks and announcements, and the deputies did not know how many persons occupied the residence or whether they were hostile. The drawing of firearms was necessary. The officers did not know who or what might be behind the door at the time they entered the apartment, nor did they know how many occupants there were and whether they were hostile. (6-ER-967-968.) Once the officers ascertained there was no danger, they immediately directed their firearms away from the direction of Appellants.

-26-

(Boydston SER-33-34, ¶33.)  Appellants admit that less than twenty seconds elapsed from the time of entry until all firearms were holstered.  (3-ER-463:17–464:3; 5-ER-871-876.)  In addition, Boydston estimated the guns directed towards Appellants lasted 5 to 30 seconds.  (Boydston SER-34-35, ¶34.)  There is no assertion that any of the Appellants were forced to the ground or subjected to any physical harm during the sweep.  The only fact about the protective sweep that Appellants "dispute" in Boydston's Separate Statement is Fact No. 33, where Appellants argue that Cornett and Boydston did not have any information that Appellants were armed and dangerous.  (Boydston SER-33-34, ¶¶33.)[11]  But this "dispute" does not change the dispositive fact that once officers ascertained there was no danger in the 5 to 30 seconds after they entered the apartment, they immediately redirected their guns away from Appellants.  (Boydston SER-34-35, ¶¶34.)  In sum, the force used was reasonable.

There is no case holding that the mere pointing of a firearm during a protective sweep is *per se* excessive force.  On the contrary, as one court has noted, "[T]here is no constitutional right to not have a federal officer point his weapon and demand that a person not move after entering a residential room through a

---

[11] The district court correctly concluded that Appellants "dispute this fact [No. 33], but they offer no evidence that contradicts it."  (1-ER-6, n. 9.)

closed door." *Bernstein v. Unites States,* 990 F.Supp. 428, 438 (D.S.C. Nov. 10, 1997).

Instead, the issue of whether the pointing of a firearm during a protective sweep constitutes excessive force depends on the circumstances. See *Graham,* 490 U.S. at 396. And the circumstances here involved: (1) an uncooperative subject; (2) a subject who had failed to present herself or open the door of her residence in response to knocks and announcements; (3) the consequent need to enter the residence without knowing who was in the residence, how many persons were in the residence, whether the occupants were armed, and whether the occupants posed a danger to law enforcement; (4) a brief protective sweep; (5) the redirection of firearms within thirty seconds after the first contact with Appellants; and (6) no physical harm to any of the occupants. The brief unholstering and pointing of firearms under these circumstances was objectively reasonable pursuant to the authorities cited above.

Appellant Browder relies on *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002), but *Robinson* is inapposite. In that case, officers confronted the plaintiff outside of his home where they could clearly see his hands and movements as he walked towards them unarmed and approaching the officers in a peaceful way. *Id*. at 1010, 1014. The plaintiff, a retired law enforcement officer, calmly walked approximately 135 feet from his door to the street to meet police

-28-

officers and identified himself. *Id*. at 1010. As the plaintiff was attempting to comply with the officer's commands, the officer "thrust[ed] his gun three or four feet from [plaintiff's] head." *Ibid*. The plaintiff was then handcuffed and confined in a patrol car for approximately fifteen to thirty minutes before officers ascertained that he had not violated the law and released him. *Id*.

The facts in the present case are different. *Robinson* did not involve the execution of a search warrant. Unlike *Robinson*, the deputies were forced to enter an unfamiliar residence without knowing the number of occupants or whether they were armed or hostile. (6-ER-967-968.) Moreover, Appellant Browder did not present herself to the officers. In contrast, the plaintiff in *Robinson* presented himself outdoors and in the open to police officers, with an unbuttoned shirt indicating he was not armed. The officers in *Robinson* therefore knew exactly who they were dealing with and that there were no other potential suspects in the immediate vicinity who might pose a threat. Unlike the situation in *Robinson*, it was reasonable for Boydston to point his weapons in Appellants' direction while conducting an initial protective sweep of the residence when executing a search warrant.

The other cases Appellant Browder cites (OB, pp. 64–66) are similarly distinguishable. *Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005), overruled on other grounds by *United States v. King*, 687 F.3d 1189 (9th Cir. 2012), involved a

-29-

situation in which an officer kept his firearm trained for an extended period of time on a tenant's five-week-old infant while searching the infant's bedroom. *Id.* at 1076 and 1088. The officer did not put the gun away until another officer came into the bedroom and assisted him with the search of that room, which lasted "at least twenty minutes." *Id.* at 1076. In the present case, however, there is nothing in the record suggesting Boydston or any other officer kept firearms trained on the juvenile Appellants for any appreciable length of time.

Finally, *Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009) involved outrageous facts consisting of police officers "[breaking] into [the plaintiff's] home" without a warrant or probable cause. *Id.* at 759. In *Hopkins*, two police officers obtained information from a "third-party that [plaintiff] *Hopkins* had been involved in an extremely minor traffic incident, an incident so minor that it did not cause as much as a scratch on either of the vehicles involved, and that he appeared to have been drinking." *Ibid*. The two officers arrived at plaintiff's house. *Id*. at 761. When the plaintiff did not respond to knocks on his door, the officers "discussed with each other possible explanations for [plaintiff's] not answering. Among the explanations they came up with was the possibility that Hopkins was on the brink of a diabetic coma." *Ibid*. The officers used the "exigent" circumstances of the medical emergency of a diabetic coma to cut a screen door and enter plaintiff's house with guns drawn. *Ibid*. "[W]ith their guns drawn and

flashlights shining," the officers found plaintiff lying on the floor of in his bedroom because he fell off his bed in terror when he saw the officers enter his bedroom with guns drawn. *Ibid*. One of the officers continued to point his gun at plaintiff even after the other officer handcuffed him. *Id*. at 777. The *Hopkins* court held that this use of force was unreasonable because one officer stated when plaintiff "got up from the bedroom floor, he knew that [plaintiff] '"was not a threat to officer safety."'" *Id*. at 776. The other officer stated that "he did not holster his weapon until after [plaintiff] was handcuffed … and nonthreatening." *Id*. at 777. Furthermore, the officers' testimony that their reason for entering plaintiff's home without a warrant "was that they suspected he was suffering from a medical emergency suggest[]s that they were fully aware at all times that [plaintiff] did not pose a threat to anyone." *Ibid*.

*Hopkins* is distinguishable because in that case it was undisputed that the officers knew the plaintiff posed no threat when they entered the residence without a warrant, pointed their guns at him as he was lying on the ground, and even after he was handcuffed. In contrast, there is no evidence that Boydston knew that the occupants of the apartment did not pose a threat when he initially entered the apartment to assist Cornett in executing the search warrant.

Appellants argue that they "were unarmed and posed no threat to Appellees." (OB, p. 65.) But Appellants failed to provide any case law or

evidence that any of the detectives knew that Appellants had no weapons hidden in their persons or that they did not pose a potential danger to the officers. In fact, the opposite is true. Detectives can be heard in the audio recording entering the apartment and asking Appellants to put their hands up and for them to be searched. (3-ER-357.) After determining that Appellants posed no danger, Boydston pointed his gun away from Appellants and continued with his protective sweep. (Boydston SER-33-34, ¶33.) This Court has found this type of conduct to be reasonable. See *Hart v. Benton County (or) Sheriff's Office*, 654 Fed.Appx. 270, 274–275 (9th Cir. 2016) (finding officers' use of force in pointing their guns at occupants of a house briefly while they secured the premises and ascertained the occupants were non-threatening during an executing a search warrant was reasonable). Taking into account "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," Boydston's use of force during the protective sweep was reasonable. *Graham*, 490 U.S. at 396–397.

Thus, the granting of summary judgment to Boydston on this excessive force claim was properly granted.

**B.      Boydston Is Entitled To Qualified Immunity In Connection With The Protective Sweep Of Appellants' Apartment.**

Even assuming *arguendo* that Boydston used excessive force during the protective sweep, he nonetheless would be entitled to summary judgment as to Appellants' Fourth Amendment excessive force claim on the basis of qualified immunity.  Law enforcement officers are shielded from suit unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  "[T]he first step in the analysis is an inquiry into the objective reasonableness of the officer's belief in the *necessity* of his actions, and there is no Fourth Amendment violation if the officer can satisfy this standard."  *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (emphasis in original).  In resolving this first inquiry, the court determines whether the evidence, taken in the light most favorable to plaintiff, shows that defendant was reasonable in his belief that his conduct did not violate the Constitution.  *Id*. at 955.

"The second step of the analysis, which the court reaches only if it determines that the alleged conduct violates a clearly-established constitutional right, is to inquire whether the officer was reasonable in his belief that his conduct did not violate the Constitution."  *Id*.  In other words, even if defendant's actions did violate the Fourth Amendment, a "reasonable but mistaken belief that [his]

conduct was lawful would result in the grant of qualified immunity." *Ibid*. It is a plaintiff's burden to show a clearly established law. *Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012 (1984).

Qualified immunity thus "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Ibid*. (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). Moreover, officers, like Boydston, are presumed to be protected by qualified immunity. *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994). "To overcome this presumption [of qualified immunity protection], a plaintiff must show that the officer's conduct was 'so egregious that any reasonable person would have recognized a constitutional violation.' [Citation.]" *Ibid*.

The standard is a demanding one and has not been met in this case. Appellants failed to present evidence establishing that it was "sufficiently clear that every reasonable official would have understood that what [Boydston was] doing violate[d]" Appellants' constitutional rights when Boydston assisted in the protective sweep of Appellants' apartment. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074 (2011). The Supreme Court has repeatedly held that clearly established law should not be defined at a high level of generality. *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305 (2015). The Supreme Court reiterated the importance of "specificity" for clearly established law in the Fourth Amendment

context and held that officers were entitled to qualified immunity. A plaintiff "must identify a case that … addresses facts like the ones at issue here." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6, 142 S.Ct. 4 (2021) (reversing this Court because no specific case put officer on notice). "[S]pecificity is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Ibid.* (citing *Mullenix*, 577 U.S. at 12). Taking into consideration all the circumstances of Boydston's encounter with Appellants, it is not at all evident that "clearly established law" prohibited his conduct.

Appellants have failed to establish that there was a clearly established law preventing Boydston from relying on Cornett's representation that there was a valid search warrant to search the residence. This Court's opinion in *Ramirez*, holds otherwise. *Ramirez v. Butten-Silver Bow County*, 298 F.3d 1022, 1028 (9th Cir. 2002) (line officers were entitled to qualified immunity irrespective of constitutional violation because they were allowed to rely on lead investigator's representation about the validity of the warrant). Also, there was no clearly established law preventing Boydston from detaining Appellants while executing a search warrant and conducting a protective sweep of the residence. *Summers*-type detentions are categorical and do not require any particular suspicion of criminal

activity. In addition, as set forth above, the cases cited in Appellants' OB (*Robinson, Motley*, and *Hopkins*) do not provide clearly established law that would have put Boydston on notice that pointing his weapon towards Appellants' direction for less than 30 seconds while performing an initial protective sweep during the execution of the search warrant was unlawful.

Thus, Boydston is entitled to qualified immunity from Appellants' Fourth Amendment excessive force claim.

## V. The District Court Properly Granted Boydston Summary Judgment On Appellants' Unreasonable Search Claim.

### A. Appellants' Unreasonable Search Claim Fails As A Matter Of Law Because There Was A Valid Search Warrant.

The Fourth Amendment protects the people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable" and police may not enter a suspect's home without a warrant absent exigent circumstances. *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371 (1980). A search warrant is valid if (1) it is issued by a neutral magistrate judge, (2) supported by probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense, and (3) must describe the things to be seized and the place to be searched

with particularity. *United States v. Artis*, 919 F.3d 1123, 1129 (9th Cir. 2019).

The undisputed evidence establishes that Cornett obtained a search warrant prior to searching Appellants' residence. (Boydston SER-29, ¶20.) The warrant also contained an affidavit by Cornett that provided probable cause of evidence in Appellant Browder's residence that would aid in her arrest. (Boydston SER-29, ¶20.) Thus, there was a valid search warrant to search Appellants' apartment upon which Boydston reasonably relied.

### 1. Boydston Reasonably Relied Upon A Valid Search Warrant.

Assuming *arguendo* the search warrant was invalid, Boydston is still entitled to summary judgment because he reasonably relied on Cornett's representation that the search warrant was valid. This Court has found that a line officer's reliance on the lead investigator's representation that the search warrant was valid is objectively reasonable. See *Ramirez*, 298 F.3d at 1028 (line officers were entitled to qualified immunity irrespective of constitutional violation because they were allowed to rely on lead investigator's representation about the validity of the warrant). "[Line officers] may accept the word of their superiors that they have a warrant and that it is valid. So long as they make inquiry as to the nature and scope of the warrant, their reliance on leader's representation about it is reasonable." *Ibid*.

The undisputed facts establish that Boydston's role in this incident was solely that of a line officer. His role did not go beyond assisting in the execution search warrant. (Boydston SER-30, ¶22.) He only became involved in the investigation when he was asked to be part of the search warrant team and was given the nature and scope of the search warrant. (Boydston SER-30-31, ¶¶23–24.)[12] Boydston could not have possibly known that Cornett's search warrant affidavit had omitted statements that could have made the search warrant invalid since he was not part of the investigation and since he did not draft the affidavit. (Boydston SER-29-30, ¶¶20–21.)[13] As a line officer, Boydston relied on the lead investigator's (Cornett) representation that they had a valid search warrant. See *Ramirez*, 298 F.3d at 1028 ("[line officers] do not have to actually read or even see the warrant; they may accept the word of their superiors that they have a warrant and that it is valid"); *United States v. Hensley*, 469 U.S. 221, 232, 105 S.Ct. 675 (1985) (an officer cannot be held liable for his good faith belief in what other officers told him, even if it turns out to be wrong). Thus, Boydston could reasonably rely on Cornett's representation that he had search warrant.

---

[12] The district court correctly concluded that Appellants "partially dispute this fact [No. 23], but they offer no evidence that contradicts it." (1-ER-6, n. 8.)

[13] The district court correctly concluded that Appellants "dispute this fact [No. 21], but they offer no evidence that contradicts it." (1-ER-6, n. 7.)

Furthermore, Appellants do not argue, and therefore concede, that Boydston relied on Cornett's representation that there was a valid search warrant. (Boydston SER-30-31, ¶¶23–24); *Ramirez v. Ghilotti Bros. Inc.*, 941 F.Supp.2d 1197, 1210 (N.D. Cal. 2013) (holding that argument was conceded where the defendant failed to address it in its opposition). As such, summary judgment was properly granted in favor of Boydston as to Appellants' Fourth Amendment claim for unreasonable search of property.

## B. Boydston Is Entitled To Qualified Immunity On Appellants' Claim Of An Unreasonable Search Of Their Apartment.

Even assuming *arguendo* that Boydston somehow unreasonably searched Appellants' apartment, he nonetheless would be entitled to summary judgment on the basis of qualified immunity. Appellants are unable to establish that there was clearly established law preventing Boydston from relying on Cornett's representation that there was a valid search warrant to search the apartment. This Court's opinion in *Ramirez*, 298 F.3d at 1028, holds otherwise.

Thus, Boydston was properly granted summary judgment on Appellants' Fourth Amendment claim for an unreasonable search of their apartment.

## VI. The District Court Properly Granted Boydston Summary Judgment On Appellants' Unreasonable Seizure Claim.

### A. Appellants' Detention During The Execution Of The Search Warrant Was Lawful.

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Enslin*, 327 F.3d 788, 795 (9th Cir. 2003). The Supreme Court has repeatedly recognized that officers executing a search warrant are entitled "to detain the occupants of the premises while a proper search is conducted." *Bailey*, 568 U.S. at 193 (citing to *Summers*, 452 U.S. at 702.) This is a "categorical" rule allowing for the detention of all occupants, even if the officers lack "particular suspicion" that the occupants were "involved in criminal activity or pose[] a specific danger to the officers." *Bailey*, 568 U.S. at 193.

Appellants were briefly detained while the search warrant was executed. Upon entering the residence, detectives detained Appellants and escorted them outside of the apartment, while they continued to conduct a protective sweep of the residence. (Boydston SER-32-34, ¶¶27–33.)[14] Thus, there are no constitutional violations from the initial detention.

---

[14] The district court correctly concluded that Appellants "dispute this fact [No. 33], but they offer no evidence that contradicts it." (1-ER-6, n. 9.)

**B.** **There Was Probable Cause To Arrest Appellant Browder For Forgery.**

Even assuming that Boydston was an integral participant in Cornett's arrest of Appellant Browder for forgery (which he was not), there was probable cause for Cornett to arrest her. A warrantless arrest is reasonable for Fourth Amendment purposes if the officer has probable cause to believe the suspect has committed a crime. *District of Columbia v. Wesby*, 583 U.S. 48, 56, 138 S.Ct. 577 (2018). To determine whether probable cause existed for purposes of an arrest, courts examine "the events leading up to the arrest" to determine whether the facts, "viewed from the standpoint of an objectively reasonable police officer," amount to probable cause. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (2003).

Probable cause is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338, 134 S.Ct. 1090 (2014). Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a "fluid concept" (*Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317 (1983)) and can be based on hearsay and other inadmissible evidence, as well as circumstantial evidence (*Hart v. Parks*, 450 F.3d 1059, 1066–1067 (9th Cir. 2006)). It does not require "certainty or even a preponderance of the evidence" (*Gates,* 462 U.S. at 246), and certainly not the quantum of evidence necessary to support a criminal conviction. See *Adams v. Williams*, 407 U.S. 143, 149, 92 S.Ct. 1921 (1972). And where, as here, the

-41-

suspect admits to facts indicating that a crime has been committed, *i.e.,* admits to signing Reed's name on the 2016 lease renewal, probable cause is particularly evident. See *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990).

The facts available to Cornett "suggest[ed] a fair probability" that Appellant Browder had committed both forgery and child endangerment. The offense of forgery under Penal Code § 470 involves four elements: (1) the defendant signed someone else's name to a contract; (2) without the other person's authority; (3) the defendant knew she did not have that authority; and (4) the defendant intended to defraud at the time the contract was signed. *See* CALCRIM No. 1900.

As to the "without authority" element, Appellant Browder notes perfunctorily in her OB that she told Cornett that Reed had given her consent to sign his name on the lease renewal document. (OB, 14, 15, and 19; Boydston SER-22-23, ¶6.)[15] However, her legal argument concerning probable cause to arrest focuses primarily, if not exclusively, on the specific intent element of forgery. (See OB, 35–42.) Arguments that are undeveloped and/or unsupported by citation to authority are waived. See *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010).

---

[15] The district court correctly concluded that Appellants "partially dispute this fact [No. 6, that Reed told Cornett he did not agree to co-sign the second lease], but they offer no evidence that contradicts it." (1-ER-5, n. 5.)

Even assuming *arguendo* that Appellant Browder sufficiently raised the consent issue in her OB, she failed to support it with any evidence aside from her own self-serving declaration. Appellant Browder failed to offer any text, email, letter, or other writing tending to establish that Reed gave her permission to affix his signature to the lease renewal. (Boydston SER-36-37, ¶38.)[16]

Cornett was under no obligation to accept Appellant Browder's version of events over that of Reed. See *Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015). "The mere existence of some evidence that could suggest [consent] does not negate probable cause." *Id.* Cornett duly documented in his post-arrest report the fact that Appellant Browder claimed she had been given authorization by Reed. (See 6-ER-1082.) But probable cause is not eviscerated merely because Cornett "simply believed [Reed's] version of the incident to be more credible." See *Yousefian,* 779 F.3d at 1014. Cornett asked Appellant Browder to provide evidence supporting her claim that Reed had given her permission, but she was unable to provide any such evidence. (See 5-ER-899.) Under these circumstances, a reasonable officer could conclude there was probable cause to believe Reed had not given Appellant Browder permission.

---

[16] The district court correctly concluded that Appellants "dispute the fact [No. 38] that Browder provided no proof to Cornett that Reed gave her consent to sign the 2016 Lease, but Plaintiffs offer no evidence that contradicts that fact." (1-ER-6, n. 10.)

Appellant Browder also contends that because specific intent is an element of the offense, Cornett was required to have probable cause as to that element and that he "lacked evidence" of Appellant Browder's specific intent to defraud. (OB, 35–42.) In fact, the evidence available to Cornett raised a reasonable inference that Appellant Browder had an intent to defraud.

Reed told Cornett that he had initially agreed to "help" Appellant Browder by co-signing the lease in 2015, indicating that Appellant Browder needed assistance and would not be able to afford the Nisqualli apartment on her own. Reed also told Cornett that, when the initial lease period was about to expire, Appellant Browder reached out to him but this time Reed refused to co-sign the renewal. (6-ER-1080; Boydston SER-22-23,¶¶ 5–6.) Cornett also knew from Denise Tellez, the account administrator of the apartment complex, that the lease renewal had not been signed in the presence of apartment management or supported by presentation of identification cards. Tellez also told Cornett that Appellant Browder was told that in order to drop Reed from the lease, Reed would need to sign some paperwork, which was never done. (6-ER-1079.) Finally, Cornett knew that Appellant Browder had subsequently been evicted for non-payment of rent after the lease had been renewed, indicating she could not afford to

live in the Nisqualli apartment on her own and without Reed co-signing.  (6-ER-965, 983, 1012, and 1079; Boydston SER-24-25, ¶11.)[17]

This information, when viewed in the totality of the circumstances (including Appellant Browder's failure to cooperate with the investigation), would allow a reasonable officer in Cornett's position to infer that Appellant Browder forged Reed's name to establish probable cause that Appellant Browder intended to defraud the lessor of the Nisqualli apartment.

The cases cited by Appellant Browder (OB, 36–39) do not compel a contrary conclusion.  In *Allen v. City of Portland*, 73 F.3d 232 (9th Cir. 1995), the plaintiff's husband had a dispute with a restaurant concerning the use of a discount card to pay for a meal worth $25.  This Court found there was no probable cause to arrest the plaintiff as a matter of law because the facts of the case "amount[ed] to a contract dispute" and there was "insufficient information to lead a reasonable person to believe that [the plaintiff] had committed a crime."  *Id.* at 238.  In contrast, Cornett had sufficient information to comprise probable cause to believe that Appellant Browder <u>had</u> committed a crime—forgery—even taking into account the omissions and misrepresentations Appellant Browder now touts.

---

[17] The district court correctly concluded that Appellants "partially dispute this fact [No. 11, that Appellant told Cornett that she was evicted for not paying rent], but they offer no evidence that contradicts it."  (1-ER-5, n. 6.)

-45-

*Kennedy v. Los Angeles Police Dept.*, 901 F.2d 702 (9th Cir. 1989), overruled on other grounds by *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872–873 (9th Cir. 1993) involved a dispute among two roommates on a lease, one of whom appropriated the property of the other as "security" to ensure the payment of a claimed debt. *Id.* at 704. The roommate who took the property was arrested for grand theft. Significantly, the officers did not believe she was holding her roommate's property for anything other than security for a debt owed. *Id.* at 706. Thus, this Court found that no reasonable person could believe there was an intent to permanently deprive the roommate of the property, which was an element of grand theft. *Ibid.*

In contrast, the inferences from the evidence developed by Cornett's investigation indicated that Appellant Browder did have the requisite specific intent to defraud. Moreover, *Kennedy* clearly involved a simple dispute between current roommates over a debt. In contrast, this case involves something more sinister – the unauthorized forgery of Reed's signature.

Similarly, *Stevens v. Rose*, 298 F.3d 880 (9th Cir. 2002) involved a dispute over ownership of an automobile that escalated into an arrest when the plaintiff attempted to literally eat the paper title to the vehicle so as to cloud title to the vehicle and then refused to return keys to the vehicle over to a deputy. *Id.* at 882. On appeal, this Court observed in dicta that probable cause can exist only in

-46-

relation to criminal conduct such that civil disputes cannot give rise to probable cause. *Id.* at 883. Notably, the defendant deputy did not argue on appeal that he had probable cause to arrest the plaintiff for attempting to eat an official document or for refusing to heed the deputy's request to stop and talk. *Ibid.* Probable cause was therefore not even an issue in *Stevens*.

## C. There Was Probable Cause To Arrest Appellant Browder For Child Endangerment.

Even assuming that Boydston was an integral participant in Cornett's arrest of Appellant Browder for child endangerment (which he was not), there was probable cause for Cornett to arrest for child endangerment. Penal Code § 273a(b) provides in pertinent part that "[a]ny person who, under circumstances or conditions other than those likely to produce great bodily harm or death ... willfully causes or permits [a] child to be placed in a situation where his or her person or health is endangered" is guilty of a misdemeanor. Section 273a(a) makes doing the same thing "under circumstances or conditions likely to produce great bodily harm or death" a felony.

Cornett witnessed conditions in Appellants' apartment that placed the persons and health of the juvenile Appellants in danger for purposes of section 273a(b). Moreover, the circumstances and conditions he observed were arguably

-47-

likely to produce "great bodily harm" to the children, which would have triggered the felony provision, section 273a(a).

Specifically, Cornett observed:

- Extremely dirty and cluttered living conditions, with the entire apartment in a state of extreme disarray (6-ER-969-970 and 1019-1066);

- Rotten food in the kitchen (6-ER-969-970, 1041-42, and 1051);

- A trash bin filled with trash and rotten food (6-ER-969-970 and 1039-1042);

- Foul odors emanating from the residence (6-ER-969-970);

- Knives and other utensils within the grasp of the children in multiple places, including at least one serrated knife in the kitchen and multiple knives laying on or next to couch cushions[18] (6-ER-970, 1034-1035 and 1044);

- A nearly empty refrigerator with little or no edible food (6-ER-970 and 1046-1050); and

---

[18] As Cornett testified in the criminal case, even so-called "butter knives" can produce harm to persons, particularly children. (See 2-ER-147:22.) In particular, such knives can produce harm if stepped or sat on inadvertently when the knives are placed on or between sofa cushions. (See 6-ER-1034-35 and 1044.) They can also produce harm in the form of poked eyes, ears, or other sensitive areas of the body if misused.

■ Appellant Browder's admission that the residence was uninhabitable. (5-ER-902:2-3.)

Unusually filthy and unsanitary living conditions may constitute child endangerment under California law. *Freeman v. Cate*, No. 10-1987-DMS-MDD, 2012 Westlaw 6162518 at \*34 (S.D. Cal. July 31, 2012), report and recommendation adopted by 2012 Westlaw 6161946 (S.D. Cal. Dec. 11, 2012), aff'd 705 Fed.Appx. 513 (9th Cir. 2017); *People v. Odom*, 226 Cal.App.3d 1028, 1033 (1991); *People v. Harris*, 239 Cal.App.2d 393, 398 (1966). The apartment involved such conditions. The photographs of the residence particularly attest to that fact. And Appellant Browder herself acknowledged that the apartment was not habitable. (5-ER-902:2-3.) The facts and information available to Cornett at the time therefore "suggest[ed] a fair probability" that Appellant Browder had committed (and was committing) child endangerment under section 273a. *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006).

Appellants incorrectly assert that the basis for the child endangerment charge "comes solely from the fact that her house was messy...." (OB, 51.) This overlooks the evidence of the existence of knives and other utensils in various locations accessible to the children, the existence of rotting food in the kitchen,[19]

---

[19] Appellant Browder asserts that "[a]ll of her food was packed" and "[h]er eating utensils were packed away, ready to be moved." (OB, 51, 52.) The photographs belie these misrepresentations. (6-ER-1018-1066.)

the foul odors in the residence, the relative absence of edible food, and Appellant Browder's admission of inhabitable conditions. Probable cause for the arrest for child endangerment came from the totality of the conditions, not merely because the house was in extreme disarray. *Wesby,* 583 U.S. at 56–57.

As they did below, Appellants rely on *Maric v. Alvarado*, 748 Fed.Appx. 747 (9th Cir. 2018). (See OB, 50–51.) But *Maric* involved vastly different circumstances. The plaintiff in that case was "breaking property" in hostile fashion in front of his family, but there is no indication that the conditions in the residence at issue in *Maric* were even remotely as dirty, unsanitary, or in as much disarray as the conditions in the Appellants' apartment. *Id.* at 748. There is also no indication that the plaintiff in *Maric* admitted the situation was not habitable. Moreover, the discussion in *Maric* centered primarily on whether a warrantless entry was justified by the exigent circumstances exception to the warrant requirement (see *id.* at 748–749), an issue that is not implicated by this appeal.

None of the other cases Appellant Browder cites assists her contentions, either. *People v. Wilson*, 138 Cal.App.4th 1197 (2006) involved a person who verbally and physically abused her son in extreme fashion, and compelled him to assist her in criminal activities. However, the decision does not indicate the existence of any living conditions remotely similar to those that Cornett observed in Appellants' apartment. *Id.* at 1200.

Appellant Browder also points to *In re B.M.*, 6 Cal.5th 528 (2018) for the proposition that a butter knife is not inherently dangerous. (OB, 53.) Putting aside the fact that *B.M.* did not involve a child endangerment issue, Appellant Browder is improperly attempting to compartmentalize all of the different facts and circumstances that led Cornett to conclude that the situation posed a danger to the children and was likely to produce great bodily harm. Probable cause is evaluated from a <u>totality of the circumstances</u>. *Wesby,* 583 U.S. at 57. The presence of utensils and knives – both serrated and otherwise – in places easily accessible to the children was only one of several factors that led Cornett to conclude there was probable cause to arrest for child endangerment. (6-ER-969-970.) Appellant Browder's fixation on categorizing all the knives as "butter knives" also overlooks the fact that at least one of the knives observed by Cornett was serrated and sharp, and that the "butter knives" were positioned on or next to couch cushions so that a child could easily sit on them in unsuspecting fashion or misuse them, thereby potentially causing injury.

Appellant Browder cites *Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000), which did not involve either child endangerment or probable cause issues, for the proposition that "factual disputes must be resolved in Appellants' favor." (OB, 52.) But there were no factual disputes—Appellant Browder failed to dispute any of Cornett's material facts.

Finally, Appellant Browder quotes a portion of *People v. Bernal*, 42 Cal.App.5th 1160 (2019) for the proposition that the conditions in her home were not so extreme as to constitute child endangerment.  (OB, 54.)  But the *Bernal* court never decided whether a dirty and cluttered apartment in and of itself could support a child endangerment conviction because the evidence also indicated that drug use had occurred in the home.  *Id.* at 1168.  And in any event, the decision to arrest Appellant Browder for child endangerment was predicated on more than the fact that her apartment was filthy and cluttered to the extreme.  In addition to those facts, Cornett observed rotting food in the kitchen, knives and other utensils within easy grasp of the children in multiple places in the apartment, a lack of edible food in the refrigerator, and foul odors emanating from the premises.  (Boydston SER-37-40, ¶¶39–40.)[20]  Cornett also heard Appellant Browder herself agree that the premises were not habitable.  (5-ER-902:2-3.)  Those facts, taken together, suggested a fair probability of child endangerment, thus supporting probable cause for Cornett to arrest Appellant Browder.

---

[20] With regard to Fact No. 39, the district court correctly concluded that Appellants "dispute this fact, but they offer no evidence that contradicts it—they instead provide justifications for the residence's conditions."  (1-ER-7, n. 11.)
With regard to Fact No. 40, the district court correctly concluded that Appellants "dispute this fact, but they offer no evidence that contradicts the fact that Cornett smelled a foul odor and that he assumed it came from rotting food."  (1-ER-7, n. 12.)

In sum, Cornett had sufficient probable cause to arrest Appellant Browder for child endangerment.

**D.     Boydston Is Entitled To Qualified Immunity In Connection With The Detentions And Arrests.**

Even assuming *arguendo* that Cornett did not have probable cause to arrest Appellant Browder for either forgery or child endangerment, Boydston (as a line officer) is entitled to summary judgment as to Appellant Browder's arrest-related Fourth Amendment claims on the basis of qualified immunity, which protects officials from their exercise of poor judgment, leaving only those who are "plainly incompetent or ... knowingly violate the law" susceptible to liability. See *Malley*, 475 U.S. at 341.

Given the particular facts outlined above and in light of the aforementioned authorities, not every reasonably prudent officer would know that arresting Appellant Browder under these particular circumstances violated a clearly established right. More importantly, Boydston was not the detective in charge of the investigation; instead, Boydston was a line officer. He is therefore entitled to qualified immunity in connection with Cornett's arrest of Appellant Browder for forgery and child endangerment.

**E.      Boydston Is Entitled To Prosecutorial Immunity In Connection With The Arrests.**

Boydston was (and is) also entitled to summary adjudication of the arrest-based Fourth Amendment claims and the section 1983 claim for malicious prosecution on the basis of prosecutorial immunity.  (County SER-31.)  The filing of a criminal complaint immunizes investigating or arresting officers from liability because it is presumed that the prosecutor who filed the criminal complaint exercised independent judgment in determining that probable cause for the accused's arrest existed at the time.  See *Caldwell v. City & County of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018).  The presumption can be overcome by evidence that the officer knowingly submitted false information or pressured the prosecutor to act contrary to her independent judgment. *Smiddy v. Varney*, 803 F.2d 1469, 1471 (9th Cir. 1986).

Here, there was no evidence that Boydston participated in Deputy District Attorney's Pedroza's decision to charge Appellant Browder with child endangerment.  (Boydston SER-43-44, ¶¶48–49.)[21]  On the contrary, Pedroza declared under oath that she exercised independent judgment in deciding whether

---

[21] With regard to Fact No. 48, the district court correctly concluded that Appellants "dispute this fact, but they offer no evidence that contradicts it."  (1-ER-7, n. 15.)

to file charges against Appellant Browder, and that Cornett (let alone Boydston) had no involvement with that process. (6-ER-1121-1122.)

## VII. The District Court Properly Granted Boydston Summary Judgment On Appellants' Malicious Prosecution Claim.

Even assuming that Boydston was an integral participant in Cornett's prosecution of Appellant Browder (which he was not), the district court granted summary judgment as to Appellant Browder's third claim for malicious prosecution on the basis that the Cornett had probable cause to arrest Appellant Browder. (See 1-ER-15-16.) Cornett did, in fact, have probable cause to arrest Appellant Browder for those offenses. (See *supra*, §§ VI.(b) and (c).) Accordingly, the district court's decision was correct." See *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054–1055 (9th Cir. 2009).

Appellant Browder rehashes her contention that her arrest was procured "from malicious motives and without probable cause" (see OB, 57), but she points to no particular evidence in the record demonstrating any such "malicious motives" on the part of Boydston. Moreover, as discussed above, Cornett did, in fact, have probable cause to arrest Appellant Browder, even taking into account the alleged misrepresentations and omissions. (See *supra*, §§ VI.(b) and (c).) In any event, as a line officer, Boydston possesses qualified immunity in being able to rely on the investigating detective's decisions.

-55-

**VIII.  The District Court Properly Granted Boydston Summary Judgment On Appellants' Claim For Interference Appellants' With Parent-Child Relationship.**

Even assuming that Boydston was an integral participant in Cornett's decision to place Appellant Browder's two children in temporary protective custody (which he was not), the district court summarily adjudicated Appellants' fifth claim for interference with familial relationship on the basis that: (1) the children would have been left alone once Appellant Browder was arrested and taken away; (2) no other caretaker was immediately available; and (3) Cornett had a reasonable belief that the children would be in imminent danger of serious bodily harm if left alone in a residence that Cornett believed was uninhabitable at the time, which led him to contact the County Department of Children and Family Services.  (Boydston SER-41-42, ¶¶43–45.)[22]  The district court's ruling was therefore correct.

While the Fourteenth Amendment generally provides that parents will not be separated from children without due process of law, that rule is subject to an emergency exception.  See *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 788–789 (9th Cir. 2016).  Under that exception, which is "derived from police officers'

---

[22] With regard to Fact No. 44, the district court correctly concluded that Appellants "dispute this fact, but they offer no evidence that contradicts it."  (1-ER-7, n. 14.)

community caretaking function" (*United States v. Bradley*, 321 F.3d 1212, 1214 (9th Cir. 2003)), officials may remove children from a home where there is information establishing reasonable cause to believe that the child is in imminent danger of serious bodily injury if not removed and the scope of the intrusion is reasonably necessary to avert such injury. *Kirkpatrick,* 843 F.3d at 790. The emergency exception has been properly invoked in similar circumstances. For instance, "[t]he possibility of a nine-year-old child in a house in the middle of the night without the supervision of any responsible adult is a situation requiring immediate police assistance." *Bradley,* 321 F.3d at 1215.

The undisputed facts in this case established the applicability of the exception. Appellant Browder had been arrested and was to be transported to jail. Attempts were made to contact her brother and friend. (Boydston SER-41, ¶43.) Unfortunately, none of these efforts was successful. (Boydston SER-42, ¶45.)

The children therefore faced the prospect of being left alone with no adult supervision in an apartment that was in utter disarray, had rotting food in the kitchen, was emitting foul odors, contained little to no edible food in the refrigerator, had knives and other utensils laying in areas accessible to the children, and which Appellant Browder herself acknowledged was not habitable. (Boydston SER-37-40, ¶¶39–40.) Under these circumstances, Cornett reasonably believed the apartment was not habitable and posed a health and safety risk to occupants,

particularly the minor children. And when alternative arrangements could not be made, Cornett thus had reasonable cause to contact the Department of Children and Family Services. (Boydston SER-42, ¶46.) As such, the actions of Cornett and Boydston (if any) did not violate the Fourteenth Amendment.

None of the cases cited by Appellant Browder compels a different conclusion. Appellant Browder relies in particular on *David v. Kaulukukui*, 38 F.4th 792 (9th Cir. 2022) (see OB, 59–60), but that case, which was decided at the pleading stage, did not involve a situation in which the sole custodial parent was arrested and thus unavailable to care for her minor children. *David* also involved unique allegations that a police department employee had violated a preexisting court order by assisting the biological father (who was a fireman) of the plaintiff's daughter in obtaining a temporary restraining order against the plaintiff, which prevented the plaintiff from having any contact with the daughter for a period of twenty-one days. *David,* 38 F.4th at 795. The present case involves no such extreme facts. Finally, in *David* "[t]here [was] no indication that [the defendant police officer] was led to believe there were any circumstances presenting an emergent risk to [the juvenile daughter]." *Id.* at 802. In contrast, Cornett had a reasonable belief that Appellant Browder's children would be in imminent danger of serious bodily injury if left alone.

In any event, as a line officer, Boydston possesses qualified immunity in being able to rely on the investigating detective's decisions. Thus, summary judgment was properly granted to Boydston on this claim.

## IX. The District Court Properly Granted Boydston Summary Judgment On Appellants' Claim For Deliberate Fabrication Of Evidence.

Even assuming that Boydston was an integral participant in Cornett's arrest and prosecution of Appellant Browder (which he was not), summary judgment was properly granted to Boydston on Appellant Browder' deliberate fabrication of evidence claim. To prevail on her fourth claim for deliberate fabrication of evidence, Appellant Browder was required to show that: (1) the officers deliberately fabricated evidence; and (2) the deliberate fabrication caused her deprivation of liberty. *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). As to the first prong, Appellant Browder had the obligation to identify evidence that Boydston fabricated and then establish that the falsification was deliberate by either: (1) demonstrating Boydston or Cornett continued his investigation even though they knew or should have known that Appellant Browder was innocent; or (2) demonstrating that Boydston used investigative techniques that were so coercive and abusive that he knew or should have known the techniques would yield false information. *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015).

-59-

None of the allegedly fabricated evidence was, in fact, fabricated. As to the condition of the apartment during the search, there was undisputed evidence, including numerous photographs, establishing that the condition of the premises at the time of the search was appalling, particularly for an environment in which children were living. (See Boydston SER-37-40, ¶¶39–40; 6-ER-969-970, 1018-1071, 1081.)

Appellant Browder contends that Cornett "planted butter knives throughout [the] house" and then falsely referred to them in his report as "steak knives." (OB, 62.)[23] These claims are not directed at Boydston.

In addition, the record does not support Appellant Browder's contention that the criminal charges against her were dismissed "because of" purported admissions by Cornett. Instead, the mistrial was based on the "accumulation" of three asserted procedural errors. (See 2-ER-188:2-14; 2-ER-105, 164, 168-169, and 171-172; 5-ER-839-841.)

In any event, as a line officer, Boydston possesses qualified immunity in being able to rely on the investigating detective's decisions. Thus, the district court properly granted Boydston summary judgment on this claim.

---

[23] Appellant Browder cited to 3-ER-371-372 ¶¶ 22–25. A review of those paragraphs in Appellant Browder's declaration reveal that she was referring to the actions of Cornett and not Boydston.

**X.      Appellant Browder's State Law Claims Are Meritless.**

**A.      The False Arrest Claim Fails Because There Was Probable Cause To Arrest Appellant Browder.**

In California, there is no tort liability for false arrest if there was probable cause for the arrest.  See *Carcamo v. Los Angeles County Sheriff's Dept.*, 68 Cal.App.5th 608, 620-21 (2021).  Appellant Browder argues that her false arrest claim should be reinstated because Cornett lacked probable cause to arrest Appellant Browder.  (OB, 67.)  As demonstrated above, however, Cornett did, in fact, have probable cause to arrest Appellant Browder.  (See *supra*, §§ VI.(b) and (c).)  Appellant Browder's contention therefore fails.

**B.      The Trespass Claim Fails Because Cornett Had A Valid Warrant.**

Appellant Browder argues that the dismissal of the trespass claim was improper because the warrant was rendered invalid by material misrepresentations and omissions.  (OB, 68.)  But as established above, the claimed misrepresentations and omissions were, in fact, immaterial, and the warrant was valid.  (See *supra* § V(a).)  Because the warrant was valid, there was no trespass. *Ogborn v. City of Lancaster,* 101 Cal.App.4th 448, 462 (2002); Cal. Gov't Code § 821.8.[24]

---

[24] Government Code § 821.8 provides: "A public employee is not liable for an injury arising out of his entry upon any property where such entry is expressly or impliedly authorized by law.  Nothing in this section exonerates a public employee

Moreover, Appellant Browder stipulated in the criminal case that the deputies had a lawful basis to enter the residence. (4-ER-573.) Because the deputies had a lawful purpose for entering, the trespass claim necessarily fails. *Miller v. National Broadcasting Co.*, 187 Cal.App.3d 1463, 1480 (1986).

## CONCLUSION

Based on the foregoing, Boydston respectfully asks the Court to affirm the Judgment dismissing him from the lawsuit.

Dated:  September 20, 2023          SILVER & WRIGHT LLP

By:  _/s/ John M. Fujii_____
JOHN M. FUJII
MAHADHI CORZANO
*Attorneys for Defendant-Appellee*
THOMAS BOYDSTON

---

from liability for an injury proximately caused by his own negligent or wrongful act or omission."

## CERTIFICATE OF COMPLIANCE

The undersigned certifies pursuant to Rule 32(a)(7(C) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1 that the attached Answering Brief of Thomas Boydston complies with the length limits set forth in Rule 32-1 and that the brief's type size and face comply with Rules 32(a)(5) and (6) of the Federal Rules of Appellate Procedure. The undersigned further certifies that the attached brief is proportionally spaced, has a type face of 14 points or more in Times New Roman font, and contains 13,725 words (not including cover page, corporate disclosure statement, tables, certificates, signature block, and proof of service) based on the word count from Word for Microsoft 365.

Dated: September 20, 2023     SILVER & WRIGHT LLP

By: _/s/ John M. Fujii_____
JOHN M. FUJII
MAHADHI CORZANO
*Attorneys for Defendant-Appellee*
THOMAS BOYDSTON

## STATEMENT OF RELATED CASES

Pursuant to Rule 28-2.6, Ninth Circuit Rules, the undersigned counsel of record for the City, certifies that he has no knowledge of any related cases pending in this Court.

Dated: September 20, 2023          SILVER & WRIGHT LLP


By: _/s/ John M. Fujii_____
JOHN M. FUJII
MAHADHI CORZANO
*Attorneys for Defendant-Appellee*
THOMAS BOYDSTON

-64-

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2023, I electronically filed the foregoing **Answering Brief of Appellee Thomas Boydston** with the Clerk of the Court for the United States Court of Appeal for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATE: September 20, 2023

*/s/ Janae O'Connor*

JANAE O'CONNOR

-65-